IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| ROBERT E. LARSON; TYLER W. GASSMAN; and PAUL E. STATLER, | ) ) ) | No. 33179-2-III |
| Appellants, | ) ) | |
| v. | ) ) | PUBLISHED OPINION |
| STATE OF WASHINGTON, | ) ) | |
| Respondent. | ) ) | |

LAWRENCE-BERREY, A.C.J. — The wrongly convicted persons act (WCPA),

chapter 4.100 RCW, provides statutory compensation for wrongly convicted persons who

prove they were actually innocent. To receive compensation, a claimant must prove six

elements by clear and convincing evidence.

Robert Larson, Tyler Gassman, and Paul Statler (the claimants) appeal the trial

court's decision that they failed to establish the fourth and fifth elements of their WCPA

claims. We interpret the fourth WCPA element (significant new exculpatory information)

liberally, to reflect the remedial purpose of the legislation, so a wrongly convicted person

may more readily receive statutory compensation. We interpret RCW 4.100.060(3) as

authorizing a trial court to admit evidence that would otherwise be excluded under the

rules of evidence. Finally, we interpret the burden of proof for the fifth WCPA element

(actually innocent) to be clear and convincing evidence.

As a result, we (1) reverse the trial court's interpretation of "significant new

exculpatory information," (2) hold that the trial court did not abuse its discretion by

excluding hearsay evidence, and (3) reverse the trial court's imposition of an improperly

high burden of proof on the "actually innocent" element. We remand to the trial court for

it to decide whether the claimants have proved by clear and convincing evidence they are

actually innocent.

## FACTS

The parties tried this case to the bench. The trial court heard testimony from 15

witnesses over a period of four days, and admitted and reviewed numerous exhibits. The

trial court prepared and issued an extensive written decision, consisting of 44 findings of

fact. The claimants assign error to only two of these findings. We therefore set forth the

pertinent findings of the trial court, and separately analyze the two disputed findings:

> After reviewing the evidence and being mindful of the arguments of
> the parties, the Court finds by clear and convincing evidence the following
> facts:

> 1. Sometime in April, 2008, Anthony Kongchunji, Matthew Dunham,
>    and three other males assaulted and robbed Eric Weskamp and

Clifford Berger. After committing the robberies, one of the fleeing robbery suspects fired a gun from Mr. Dunham's vehicle towards Kyle Williams and Mr. Weskamp.

2.  During the time period of April, 2008, Robert Larson was residing in a trailer behind his parent's home. This residence was approximately three blocks from the Quarry Tile Company where Mr. Larson was employed.

3.  On the days he was scheduled to work, Mr. Larson consistently clocked into work between 9:46 p.m. and 9:55 p.m. Mr. Larson testified that he habitually arrived at work between 9:10 p.m. and 9:20 p.m.

4.  During the time period of April, 2008, Robert Hibdon was Mr. Larson's supervisor at the Quarry Tile Company. Mr. Hibdon testified that it was necessary for Mr. Larson to arrive at work a few minutes before the beginning of his shift.

5.  During the time period of April, 2008, Tyler Gassman was unemployed and residing with his girlfriend, Elizabeth Holder, in northern Idaho. Mr. Gassman resided with Ms. Holder for approximately one year.

6.  Mr. Gassman testified that in the one year he resided with Ms. Holder, he never left the residence without her.

7.  During the time period of April, 2008, Paul Statler was residing with his mother on Dick Road. Also residing with Mr. Statler and his mother was Mr. Statler's girlfriend, Ashley Shafer, and Shane Neilson.

8. During the period of April, 2008, Mr. Statler was being monitored by a [violent incident criminal apprehension program (VICAP)] through the Department of Corrections. Mr. Statler was required to provide breath samples in the VICAP every day at 6:00 a.m., 6:00 p.m., and 10:00 p.m. Mr. Statler would have to be available for a short period of time both before and after each breath sample time.

9. Between late March, 2008 through April, 2008, Mr. Weskamp and Mr. Berger were attempting to purchase OxyContin from Mr. Kungchunji. The sale price of the OxyContin was $4000.

10. At some point between late March, 2008 through April, 2008, Anthony Kongchunji was riding as a passenger in a vehicle driven by Matthew Dunham. There were three additional males in the back seat of the vehicle. During this trip, Mr. Kongchunji placed a call to Mr. Weskamp as these five individuals were on their way to sell OxyContin to Mr. Weskamp and Clifford Berger.

11. Once Mr. Kongchunji and Mr. Dunham arrived at Mr. Weskamp's house, the three males in the back seat of the vehicle got out and, with their faces covered by bandanas, hid and waited for Mr. Weskamp and Mr. Berger. At least one of the three men was armed with a shotgun or rifle.

12. Once Mr. Weskamp and Mr. Berger emerged from the house, the three males with bandanas covering their faces assaulted and robbed Mr. Weskamp and Mr. Berger. One of the males used either or shotgun or rifle during the assault.

13. Subsequent to the robbery, the five males returned to Mr. Dunham's truck and fled the scene. Kyle Williams and Mr. Weskamp gave chase in Mr. Williams's vehicle until shots began being fired from Mr. Dunham's vehicle.

4

14. Later, on April 23, 2008, Mr. Kongchunji and Mr. Dunham were arrested for a similar type of robbery. Shortly thereafter, law enforcement received information that the firearm used by Mr. Kongchunji and Mr. Dunham in the most recent robbery was at Mr. Statler's residence.

15. In the early morning hours of April 24, 2008, Det. McCrillis went to Mr. Statler's house and recovered a shotgun which was hidden under Mr. Statler's mother's mattress. The shotgun recovered was similar to the shotgun used in the April 23, 2008, robbery as well as the firearm used in the robbery of Mr. Weskamp and Mr. Berger.

16. After being arrested on April 23, 2008, Mr. Kongchunji chose not to speak with law enforcement. Mr. Dunham, on the other hand, continually provided false statements to law enforcement concerning his involvement in the robberies.

17. Once booked into jail, Mr. Kongchunji and Mr. Dunham spent approximately one month housed in the same unit of the Spokane County Jail. During this time, Mr. Kongchunji and Mr. Dunham had numerous opportunities to communicate with one another.

18. Prior to resolving his charges, Mr. Kongchunji chose to engage in a free-talk with the State. In consideration of providing information to law enforcement, Mr. Kongchunji was seeking a non-prison sentence. During the free-talk, Mr. Kongchunji identified the three males involved in the robberies against Mr. Weskamp and Mr. Berger as Mr. Larson, Mr. Gassman, and Mr. Statler.

19. Subsequent to the free-talk, the State failed to offer Mr. Kongchunji a non-prison sentence. Mr. Kongchunji responded by alleging that Mr. Larson, Mr. Gassman, and Mr. Statler were not involved in the robberies. Det. Marske informed Mr. Kongchunji that if he lied at

trial he would be charged with perjury. Neither the State nor the plaintiffs called Mr. Kongchunji as a witness at the criminal trial. Mr. Kongchunji never asserted his Fifth Amendment protections against self-incrimination, he simply was never called as a witness.

20. Similarly, Mr. Dunham, who was 17 years old at the time of his arrest, engaged in a free-talk with the State. Like Mr. Kongchunji, Mr. Dunham was facing a substantial prison sentence. Also, like Mr. Kongchunji, Mr. Dunham identified the three males involved in the robberies against Mr. Weskamp and Mr. Berger as Mr. Larson, Mr. Gassman, and Mr. Statler.

21. Unlike Mr. Kongchunji, Mr. Dunham testified at the plaintiffs' criminal trial that Mr. Larson, Mr. Gassman, and Mr. Statler were involved in the robberies of Mr. Weskamp and Mr. Berger. In consideration of his cooperation, Mr. Dunham was given a sentence of 17 months confinement in a juvenile detention facility.

22. On July 28, 2008, Plaintiff Robert Larson, was charged by information in the Spokane Superior Court under case number 08-1-02445-9 with Count I—First Degree Robbery, Count II—Attempted First Degree Murder (or in the alternative First Degree Assault), Count III—Attempted First Degree Murder (or in the alternative First Degree Assault), Count IV—Drive by Shooting, and Count V—Drive by Shooting. The information alleged these crimes occurred on or about April 15, 2008.

23. On July 28, 2008, Plaintiff Tyler Gassman, was charged by information in the Spokane Superior Court under case number 08-1-02444-1 with Count I—First Degree Robbery, Count II—Attempted First Degree Murder (or in the alternative First Degree Assault), Count III—Attempted First Degree Murder (or in the alternative First Degree Assault), Count IV—Drive by Shooting, and Count V—

Drive by Shooting. The information alleged these crimes occurred on or about April 15, 2008.

24. On July 28, 2008, Plaintiff Paul Statler, was charged by information in the Spokane Superior Court under case number 08-1-02442-4 with Count I—First Degree Robbery, Count II—Attempted First Degree Murder (or in the alternative First Degree Assault), Count III— Attempted First Degree Murder (or in the alternative First Degree Assault), Count IV—Drive by Shooting, and Count V—Drive by Shooting. The information alleged these crimes occurred on or about April 15, 2008.

25. On January 12, 2008, the State moved to amend each plaintiff's information. The Court granted the motions and each plaintiff's information was amended, alleging the crimes occurred on or about April 17, 2008.

. . . .

27. The criminal trial was held in February, 2009. At trial, all three plaintiffs presented alibi defenses.

28. At the conclusion of the trial, Mr. Larson, Mr. Gassman, and Mr. Statler were each found guilty of First Degree Robbery, two counts of First Degree Assault, and two counts of Drive by Shooting.

. . . .

35. Subsequent to being convicted, all three plaintiffs moved for a new trial under CrR 7.5(a)(3), claiming newly discovered evidence. The Honorable Michael Price denied the motions.

36. The plaintiffs appealed Judge Price's denial of their motions for new trials. The Court of Appeals affirmed Judge Price, concluding that the motions for new trials were properly denied, the plaintiffs were not provided ineffective assistance of counsel, the plaintiffs were not prejudiced by the amended informations, and the plaintiffs were not placed in double jeopardy.[1]

37. The plaintiffs then filed motions for relief from judgment under CrR 7.8. In granting the plaintiffs' motions, Judge Price found trial counsel for each plaintiff was ineffective in a number of regards. Specifically, Judge Price found trial counsel for each plaintiff failed to obtain victim Eric Weskamp's work records,[2] failed to obtain Matthew Dunham's phone records,[3] failed to interview the detectives, and failed to interview Shane Neilson.[4]

---

[1] *State v. Larson*, 160 Wn. App. 577, 249 P.3d 669 (2011); *State v. Gassman*, 160 Wn. App. 600, 248 P.3d 155 (2011); *State v. Statler*, 160 Wn. App. 622, 248 P.3d 165 (2011).

[2] Victim Eric Weskamp's work records would have showed he left work early on April 16, 2008, the only day of the week he did so. This evidence would have allowed trial counsel to argue the crime occurred on April 15, 2008 and not April 17, 2008. Plaintiffs' Exhibit P-16, P-17 & P-18 (*Judge Price's Findings of Fact, Conclusions of Law & Order, pg. 4*).

[3] Matthew Dunham was the State's star witness. He testified he did not know the victims. The phone records contained post-conviction showed he had been in communication with the victims. This information would have assisted trial counsel in impeaching his credibility. Plaintiffs' Exhibit P-16, P-17 & P-18 (*Judge Price's Findings of Fact, Conclusions of Law & Order, pgs. 4-5*).

[4] Shane Neilson would have testified that he received the gun used in a robbery on April 23, 2008, without the knowledge of Mr. Statler. Without this information, the jury was left with the impression Mr. Statler was "in the know" about the April 23, 2008, robbery. Plaintiffs' Exhibit P-16, P-17 & P-18 (*Judge Price's Findings of Fact, Conclusions of Law & Order, pg. 5*).

38. Judge Price ultimately concluded that the plaintiffs were denied their Constitutional right to effective counsel. He found that the plaintiffs established that trial counsels' representation was deficient; falling below the objective standard of reasonableness and that the plaintiffs were prejudiced by this deficient performance.

39. Judge Price further found that trial counsels' failure to investigate was especially egregious based upon their failure to discover potentially exculpatory evidence.

40. Judge Price concluded that but for trial counsels' unprofessional errors, the result of the proceedings would have been different.

41. On December 14, 2012, Judge Price entered orders vacating the judgments of conviction against Mr. Larson, Mr. Gassman, and Mr. Statler.

42. On May 31, 2013, the Honorable James Triplet entered an order dismissing the charges against Mr. Larson. The certification forming the basis for the motion to dismiss the charges asserted the motion was founded upon insufficient evidence to proceed with trial.

43. On July 23, 2013, Judge Triplet entered orders dismissing the charges against both Mr. Gassman and Mr. Statler. The certification forming the basis for the motions to dismiss the charges asserted the motions were founded upon insufficient evidence to proceed with trial.

44.　At trial, limited evidence was presented that was not put before the jury in the criminal trial; specifically, the testimony of Mr. Kongchunji, Mr. Weskamp's time card, Kyle Williams phone records, and the testimony of Professor Alexandra Natapoff.[5]

Clerk's Papers (CP) at 407-14.

## ANALYSIS

*Overview of the WCPA*

The WCPA was passed in 2013, and came into effect on July 28 of that year. LAWS OF 2013, ch. 175, §§ 1-9. The first section of the WCPA indicates the legislature's intent and provides:

> The legislature recognizes that persons convicted and imprisoned for crimes they did not commit have been uniquely victimized. Having suffered tremendous injustice by being stripped of their lives and liberty, they are forced to endure imprisonment and are later stigmatized as felons. A majority of those wrongly convicted in Washington state have no remedy available under the law for the destruction of their personal lives resulting from errors in our criminal justice system. The legislature intends to provide an avenue for those who have been wrongly convicted in Washington state to redress the lost years of their lives, and help to address the unique challenges faced by the wrongly convicted after exoneration.

RCW 4.100.010.

To prevail on a claim under the WCPA claimants must show, by clear and

---

[5] Prof. Natapoff testified as an expert witness primarily on issues surrounding the lack of credibility of criminal informants.

No. 33179-2-III
*Larson v. State*

convincing evidence,[6] that: (1) they were convicted of one or more felonies in superior court and subsequently sentenced to a term of imprisonment, and have served all or any part of the sentence,[7] (2) they are not currently incarcerated for any offense,[8] (3) during the period of confinement for which the claimant is seeking compensation, the claimant was not serving a term of imprisonment or a concurrent sentence for any conviction other than those that are the basis for the claim,[9] (4) the judgment of conviction was reversed or vacated and the charging document dismissed on the basis of significant new exculpatory information or, if a new trial was ordered pursuant to the presentation of significant new exculpatory information, either the claimants were found not guilty at the new trial or the claimants were not retried and the charging document dismissed,[10] (5) they did not engage in any illegal conduct alleged in the charging documents,[11] and (6) they did not commit or suborn perjury, or fabricate evidence to cause or bring about their convictions.[12] The dispute in this case focuses on the fourth and fifth elements.

A.    *Convictions vacated and charges dismissed on the basis of significant new*

---

[6] RCW 4.100.060(1).
[7] RCW 4.100.060(1)(a).
[8] RCW 4.100.060(1)(b)(i).
[9] RCW 4.100.060(1)(b)(ii).
[10] RCW 4.100.060(1)(c)(ii) (there is an alternative fourth element under RCW 4.100.060(1)(c)(i), that relates to pardons, but is not applicable in this case).
[11] RCW 4.100.060(1)(d).
[12] RCW 4.100.060(1)(e).

11

*exculpatory information*

The claimants argue the trial court erred in defining "significant new exculpatory information" as evidence that was unavailable at trial. The claimants also argue the trial court erred in finding their convictions were not vacated and their charges not dismissed on the basis of the new information. These two arguments are discussed in turn below.

### 1. Significant new exculpatory information

The parties dispute the meaning of "significant new exculpatory information." That phrase is not defined in the definitional section of the statute. *See* RCW 4.100.020. "The meaning of a statute is a question of law reviewed de novo." *Dep't of Ecology v. Campbell & Gwinn, LLC*, 146 Wn.2d 1, 9, 43 P.3d 4 (2002). Statutory interpretation is used "'to determine and give effect to the intent of the legislature.'" *State v. Reeves*, 184 Wn. App. 154, 158, 336 P.3d 105 (2014) (internal quotation marks omitted) (quoting *State v. Evans*, 177 Wn.2d 186, 192, 298 P.3d 724 (2013)). If statutory language is plain and unambiguous, this court does not engage in statutory interpretation. *Berger v. Sonneland*, 144 Wn.2d 91, 105, 26 P.3d 257 (2001). We determine the phrase is ambiguous because "new" might narrowly refer to information that was unavailable at trial, or "new" might broadly refer to information that was not presented to the jury.[13]

---

[13] In *Newton v. State*, 192 Wn. App. 931, 932-33, 369 P.3d 511 (2016), Isaiah

The trial court noted that RCW 10.73.170 contains language similar to the language at issue here, and considered prior judicial interpretation of that similar language important in its analysis. We agree. RCW 10.73.170 authorizes a person convicted of a felony to submit a motion requesting postconviction DNA[14] testing. Before the motion can be granted, the moving party must demonstrate the DNA testing would provide "significant new information." RCW 10.73.170(2)(a)(iii). The trial court relied on *State v. Riofta*, 134 Wn. App. 669, 142 P.3d 193 (2006), *aff'd*, 166 Wn.2d 358, 209 P.3d 467 (2009). Because that case was reviewed by our Supreme Court, we start our analysis with *State v. Riofta*, 166 Wn.2d 358.

In *Riofta*, a man approached the victim, asked him for a cigarette, and then pulled a revolver from his coat and shot three times toward the victim, missing him each time. *Id.* at 362. The assailant fled, and in the process, left behind his white hat. *Id.* The victim knew the assailant, identified him as "Alex," and provided a physical description to the

---

Newton filed a lawsuit under the WCPA after we reversed his first degree burglary conviction. Our reversal of his criminal conviction was based on insufficiency of the evidence. *Id.* The trial court granted the State's motion for summary judgment on Newton's WCPA claim. *Id.* In affirming the trial court we stated, "significant new exculpatory information necessarily refers to something other than the appellate reversal itself. The appellate reversal must be *based on* some new information." *Id.* at 938. In *Newton*, we held "significant new exculpatory information" required "new information." Here, we more specifically address the nature of this "new information."

[14] Deoxyribonucleic acid.

investigating officer. *Id.* at 362-63. The victim looked at a photograph database and identified his assailant as Alexander Riofta. *Id.* at 363. The State charged Mr. Riofta with first degree assault with a firearm. Neither the prosecution nor the defense sought DNA testing of the white hat. *Id.* The jury convicted Mr. Riofta. *Id.* After his conviction, Mr. Riofta requested DNA testing of the white hat pursuant to RCW 10.73.170. *Id.* The trial court denied his request. *Id.* at 364. The appellate court also denied his request, holding that "[Mr.] Riofta failed to establish the DNA testing could yield 'significant new information' because the white hat was available for testing at trial." *Id.*

The Supreme Court reached the same result as the lower courts, but used a different basis. *Id.* at 367-73. Prior to discussing the different basis, the Supreme Court defined "significant new information" broadly—not narrowly—as did the appellate court. The Supreme Court held, "[RCW 10.73.170] provides a means for a convicted person to produce DNA evidence that the original fact finder did not consider, whether because of an adverse court ruling, inferior technology, or the decision of the prosecutor and defense counsel not to seek DNA testing prior to trial." *Id.* at 366. Accordingly, the Supreme Court held Mr. Riofta's request for DNA testing of the white hat was not precluded simply because such testing could have been, but was not, conducted prior to trial. *Id.*

14

Application of a similarly broad interpretation of "significant new exculpatory information" would be consistent with the legislature's intent in enacting the WCPA. The statute is remedial in nature, and "'remedial statutes are liberally construed to suppress the evil and advance the remedy.'" *Go2net, Inc. v. FreeYellow.com, Inc.*, 158 Wn.2d 247, 253, 143 P.3d 590 (2006) (internal quotation marks omitted) (quoting *Kittilson v. Ford*, 23 Wn. App. 402, 407, 595 P.2d 944 (1979)). The remedy the WCPA seeks to advance is "to provide an avenue for those who have been wrongly convicted in Washington state to redress the lost years of their lives, and help to address the unique challenges faced by the wrongly convicted after exoneration." RCW 4.100.010.

If, instead, we defined "significant new exculpatory information" narrowly to include only information unavailable at trial, the number of wrongly convicted persons eligible for relief under the WCPA would be greatly restricted. The only eligible wrongly convicted persons would be those fortunate enough to discover significant new exculpatory information that was unavailable at trial. All other wrongly convicted persons would never be able to pursue a claim under the WCPA. We hold that "new" in the context of "significant new exculpatory information" must be construed broadly to include information that was available at the criminal trial but was not presented to the fact finder.

15

*2. Convictions vacated and charges dismissed on the basis of the new information*

The trial court found that the claimants failed to prove by clear and convincing evidence their convictions were vacated and their charges were dismissed based on the new information. The trial court found the sole basis for vacation of their convictions and dismissal of their charges was deficient performance of criminal counsel. The claimants argue the trial court erred because the criminal court vacated their convictions because deficient performance of criminal counsel *caused* significant exculpatory evidence not to have been presented at trial.

The criminal court's decision to vacate the claimants' convictions was based on two documents and one witness not presented to the jury. The criminal court first discussed the work records of Eric Weskamp, records that were not presented to the jury. According to the criminal court, the work records provided "[s]trong, credible alibi evidence" that would have allowed trial counsel to argue the date of the crime was April 15, 2008 and not April 17, 2008. Ex. P-16, at 4; Ex. P-17, at 4; Ex. P-18, at 4. But the evidence went undiscovered due to the deficiencies of trial counsel.

The criminal court next discussed the telephone records of the State's main witness, Matthew Dunham. These records also were not presented to the jury. The telephone records show Mr. Dunham spoke with the victims of the Weskamp robbery

16

before the crime occurred. However, at trial, Mr. Dunham stated he did not know any of the victims of the Weskamp robbery. The telephone records contained "critical information" and raised "significant questions" about the State's account of the crime and Mr. Dunham's version of events. Ex. P-16, at 5; Ex. P-17, at 5; Ex. P-18 at 5. If trial counsel had obtained the telephone records, they would have been able to "effectively challenge the State's case and raise doubt." Ex. P-16, at 5; Ex. P-17, at 5; Ex. P-18 at 5.

The criminal court next discussed the information that could have been elicited through Shane Nielson, a witness who did not testify in the criminal trial. After the April 23 robbery, Anthony Kongchunji took the shotgun used in that robbery to Mr. Statler's home and left it there with Mr. Nielson. Mr. Nielson did not tell Mr. Statler about the shotgun until the police arrived to search the home later in the evening. Without Mr. Nielson's testimony, "the jury was left with the impression that Mr. Statler was 'in the know' about the April 23 robbery," making it more plausible he was an accomplice in the other robberies. Ex. P-16, at 5; Ex. P-17, at 5; Ex. P-18 at 5.

Based on all the above information that was not presented to the jury, the criminal court concluded the claimants were denied their right to effective assistance of counsel. The criminal court's finding that criminal counsel was ineffective was based on their multiple failures to discover "[s]trong, credible alibi evidence," "critical information,"

17

and other "potentially exculpatory evidence." Ex. P-16, at 4-5, 7; Ex. P-17, at 4-5, 7; Ex. P-18 at 4-5, 7. The criminal court vacated the convictions because the effect of criminal counsels' deficiencies undermined confidence in the verdicts. The State soon after dismissed all criminal charges because it determined it had insufficient evidence to proceed to trial. The only difference between initially proceeding to trial and later not proceeding to trial was the new information.

The State argues that the information that the criminal court found to be exculpatory was not actually exculpatory. In general, the State argues the information was not so critical or contradictory to have undermined the confidence in the jury's verdict. The State's argument misses the point. The statutory language does not ask whether the criminal court correctly vacated the convictions. Rather, the statutory language asks whether the convictions were vacated and the charges were dismissed based on the new information. The answer is an emphatic yes.

In summary, the existence of significant new exculpatory information was the sole basis for the criminal court's decision to vacate the convictions, which soon after resulted in the dismissal of all criminal charges. We hold the trial court erred when it found the

18

claimants failed to satisfy the fourth WCPA element by clear and convincing evidence.[15]

B.  *Nonadmittance of hearsay evidence despite statutory directive to give due consideration to difficulties of proof*

Despite substantial efforts, the claimants were unable to locate and subpoena Mr. Weskamp to testify at their January 2015 WCPA trial. They, therefore, sought to admit an April 2013 recorded interview between Mr. Weskamp and an investigator for the Innocence Project.

In the interview, Mr. Weskamp implicated Mr. Dunham's brother as a third person involved in the robbery, and said he was unable to identify the other person or two persons involved. By implication, Mr. Dunham lied when he did not identify his brother as an assailant. By further implication, the one or two unknown persons were not the three claimants. Mr. Weskamp further stated he was sure the robbery occurred early in the week, perhaps April 15. He said he was pressured by the State to accept the State's date, which he thought was April 18.

The State filed a motion to exclude the recorded interview. In response, the claimants argued the recorded interview should be considered pursuant to

---

[15] Claimants assign error to finding 44, "limited evidence was presented that was not put before the jury in the criminal trial." This assignment relates to the claimants' argument that they met their burden of proof on the fourth WCPA element. We agree the claimants met their burden of proof on this element and do not address this assignment.

RCW 4.100.060(3). The State argued the recorded interview was hearsay, they were not invited to participate in the interview, and admitting the recorded interview would prevent it from cross-examining Mr. Westkamp about his statements. The trial court granted the State's motion and excluded the recorded interview.

The standard of review for a trial court's decision to admit evidence under RCW 4.100.060(3) has not been articulated. RCW 4.100.060(3) provides:

> In exercising its discretion regarding the weight and admissibility of evidence, the court must give due consideration to difficulties of proof caused by the passage of time or by release of evidence pursuant to a plea, the death or unavailability of witnesses, the destruction of evidence, or other factors not caused by the parties.

Because the statute recognizes the trial court's discretionary authority to weigh and admit evidence, we hold that a trial court's decision to admit or not admit evidence under RCW 4.100.060(3) is reviewed for an abuse of discretion. *See State v. Baldwin*, 63 Wn. App. 303, 312, 818 P.2d 1116 (1991). A trial court abuses its discretion when its decision is manifestly unreasonable, or exercised on untenable grounds, or for untenable reasons. *State ex rel. Carroll v. Junker*, 79 Wn.2d 12, 26, 482 P.2d 775 (1971).

Here, the claimants argue the trial court's rigid application of evidentiary rules was an abuse of discretion because if the legislature intended hearsay rules to apply, RCW 4.100.060(3) would be superfluous. The claimants also argue policy considerations

20

favor the legislature's decision to loosen the evidentiary rules.

We agree with the claimants that the legislature loosened the rules of evidence to assist wrongly convicted persons establish their proof. We hold RCW 4.100.060(3) authorizes a trial court to admit otherwise inadmissible evidence.

But we disagree with the claimants that a trial court abuses its discretion when it enforces the rules of evidence. Evidentiary rules have a purpose—to keep out unreliable evidence.

RCW 4.100.060(3) requires the court, in its discretion, to give due consideration to difficulties of proof. If the court decides the difficulties of proof do not warrant admitting certain evidence, the court has discretion to not admit it. That is what happened here. The trial court listened to and considered the parties' arguments for and against admitting the recording. The trial court then decided against admitting the recording because (1) it was hearsay, (2) the statements in the recording were not made under oath, and (3) admission would deprive the State of its ability to cross-examine Mr. Weskamp. The trial court's decision was not manifestly unreasonable, and thus was not an abuse of discretion.

C.    *Did not engage in any illegal conduct*

RCW 4.100.060(1)(d) requires a claimant to prove by clear and convincing

21

evidence he or she "did not engage in any illegal conduct alleged in the charging documents." RCW 4.100.020(2)(a) makes the preceding quoted phrase synonymous with "actually innocent." The claimants did not assign error to the trial court's legal ruling that "charging documents" include the probable cause affidavits. Here, the probable cause affidavits included a temporal component of "on or about April 15, 2008." Ex. D-115; Ex. D-118; Ex. D-121.

The claimants argue the trial court erred when it found they did not sufficiently prove they were actually innocent. Specifically, they argue the trial court erred (1) by using a heightened burden of proof applicable to personal restraint petitions and writs of habeas corpus, (2) by requiring them to prove they could not have committed the robbery anytime in April, when the evidence established the robbery occurred on either April 4 or April 15, and (3) by not finding them actually innocent. We examine the first argument separately, but because the second and third arguments are related, we examine them together.

*1. Burden of proof*

Statutory interpretation is a question of law that this court reviews de novo. *Berger*, 144 Wn.2d at 104-05. If the statute is plain and unambiguous, this court does not engage in statutory interpretation. *Id.* at 105.

22

RCW 4.100.060 explicitly requires a claimant to prove the six statutory elements by clear and convincing evidence. "Actually innocent," being synonymous with the fifth WCPA element, is one of the statutory elements. We hold that RCW 4.100.060(1)(d) requires a claimant to prove he or she was actually innocent by clear and convincing evidence.

In its conclusions of law, the trial court resorted to the interpretations of "actually innocent" in the context of personal restraint petitions and writs of habeas corpus. The trial court noted, "The standard for establishing a freestanding claim of actual innocence is 'extraordinary high' and . . . the showing [for a successful claim] would have to be 'truly persuasive.'" CP at 425 (quoting *Herrera v. Collins*, 506 U.S. 390, 417, 113 S. Ct. 853, 122 L. Ed. 2d 203 (1993)). In concluding its analysis of whether the claimants proved their actual innocence, the trial court stated, "While the [claimants'] evidence certainly casts doubt on the State's case, they have not met their *extraordinarily high and truly persuasive standard* required for a claim of actual innocence." CP at 430 (emphasis added). Intermixed between these pages in the trial court's decision, the trial court sometimes refers to the clear and convincing burden of proof. Nevertheless, we are convinced the trial court required the claimants to meet the heightened burden of proof requirement for personal restraint petitions and writs of habeas corpus. In doing so, the

23

trial court erred.

### 2. *Application of correct standard of proof to facts*

The claimants argue the trial court erred in requiring them to prove actual innocence by proving they could not have committed the robbery anytime in April 2008. They argue the facts establish the robbery had to have occurred on either April 4 or April 15.[16] They then contend the facts establish they could not have committed the robbery on either of those two dates.[17] Thus, they argue, this court should direct a verdict in their favor on the fifth WCPA element.

First, although we agree the evidence shows the robbery probably occurred on April 15, this question is for the trier of fact. Second, the testimony is unclear if the robbery occurred when it was getting dark or when it was completely dark. Third, Mr. Dunham's recollection of a 30-minute delay between the robbery and when they divided

---

[16] Specifically, Mr. Weskamp testified in the criminal trial he worked the day of the evening when he was beaten, and missed work the following day. Examination of Mr. Weskamp's time cards establish four days he missed work, but only two in which he worked the prior day—April 4 or April 15.

[17] Specifically, records establish it was not completely dark until 9:14 p.m. on April 4. Mr. Dunham testified they drove for 30 minutes after the robbery and before returning to a house to split the stolen money. Assuming it would take five minutes to divide the money and another five minutes for Mr. Larson to travel 2.5 miles from the house to his work, the earliest Mr. Larson could have been to work was 9:54 p.m. But Mr. Larson's time card shows he clocked in three minutes earlier, at 9:51 p.m. According to the claimants, this three minute overlap establishes by clear and convincing evidence

24

the money at the house was possibly only a rough estimate.

If the timeline was as certain as the claimants contend, we might be persuaded to direct a verdict. But the facts are uncertain. We deem it proper for the trier of fact—the trial court here—to determine whether the claimants have proved by clear and convincing evidence they are actually innocent. We remand for this purpose.

## CONCLUSION

We affirm the trial court's evidentiary ruling excluding the recorded statement. We reverse the trial court's legal conclusion that "significant new exculpatory information" must be evidence that was unavailable at trial. We also reverse the trial court's legal conclusion that the claimants' evidentiary burden to prove actual innocence is greater than clear and convincing. We remand this case to the trial court for it to make a factual determination whether the claimants have proved by clear and convincing evidence they are actually innocent.

Lawrence-Berrey, A.C.J.

WE CONCUR:

Siddoway, J.

Pennell, J.

they did not commit the robbery.

25